# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

JOHNNY I. MANGU,

             Plaintiff,

v.                                       No. Civ. 13-00187 LH/CG

CLIFTON GUNDERSON LLP,
k/n/a Clifton Larson Allen LLP,
a foreign corporation,

             Defendant.

## MEMORANDUM OPINION AND ORDER

On March 25, 2013, Defendant Clifton Gunderson LLP ("Defendant") filed a Motion to Dismiss and to Compel Arbitration (ECF No. 10). Defendant requests an order dismissing Plaintiff's claims for constructive discharge and retaliation for failure to exhaust his administrative remedies and an order compelling arbitration of all remaining claims. Plaintiff objects to the entry of the requested orders, arguing that he did exhaust his administrative remedies as to his retaliation and constructive discharge claims when he supplemented his record to the EEOC. Plaintiff also contends that the arbitration agreement should not be enforced because it is unconscionable and illusory. The Court, having considered the motion, briefs, evidence, and applicable law, concludes that Defendant's Motion to Dismiss and to Compel Arbitration will be denied in its entirety.

## I.      FACTUAL BACKGROUND

Plaintiff, of Romanian national origin, began working for Defendant as a Staff Accountant on or about December 18, 2006. Compl. (ECF No. 1) ¶¶ 6-7. During his tenure, Plaintiff received average or above average performance evaluations. *See id.* ¶ 8.

On March 26, 2007, Plaintiff and Defendant signed an Employment Agreement.  Def.'s Am. Ex. B (ECF No. 13) at 4-8 of 8.  Paragraph 11 of the Employment Agreement contained the following provision:

> <u>Attorney Fees/Arbitration</u>.  The Employee agrees to reimburse Clifton Gunderson for any attorney fees, costs and expenses incurred in its successfully enforcing any part of this Agreement against the Employee in any state or federal court lawsuit and/or in its successfully defending all or part of any state or federal court lawsuit that the Employee may file against Clifton Gunderson and/or any individual in their capacity as an agent of Clifton Gunderson.  Additionally, at Clifton Gunderson's election, the Employee agrees to submit any claim asserted in a state or federal court lawsuit against Clifton Gunderson and/or any individual in their capacity as an agent of Clifton Gunderson to binding arbitration pursuant to the then current employment dispute resolution rules of the American Arbitration Association.

*Id.* at 7 of 8.   Paragraph 12(e) stated:  "<u>Choice of Law</u>.  The substantive laws of Illinois, but not the law of conflicts, shall govern the construction, validity and interpretation of this Agreement."  *Id.* at 8 of 8.

In 2010, Plaintiff reported to a high level managing partner that many foreign national employees were being passed over for promotions and not given opportunities for advancement.  Compl. (ECF No. 1) ¶ 9.  In early 2010, two other foreign national employees approached Plaintiff and told him that they had complained to Defendant about the lack of promotional opportunities and the way foreigners were being treated in the Albuquerque/Lenexa office.  *Id.* ¶ 10.  In the spring of 2010, Plaintiff complained to his manager about the work environment, informing him that he and other foreign national employees were being treated differently by the management in the Albuquerque office, including being passed over for promotions, being segregated from American employees, being ostracized and left out of important meetings, being treated with disrespect and working extreme amounts of overtime without compensation.  *Id.* ¶ 11.  Plaintiff was not aware of Defendant implementing any changes to address his and other

foreign national employees' concerns about their disparate treatment.  *See id.* ¶¶ 10, 12.

On April 9, 2011, Plaintiff filed an EEOC Charge of Discrimination.  *Id.* ¶ 14; Def.'s Mot., Ex. A (ECF No. 11-1) at 5 of 6.  Plaintiff amended the Charge of Discrimination on May 11, 2011.  Def.'s Mot., Ex. A (ECF No. 11-1) at 5 of 6.  Plaintiff checked the box for discrimination based on "National Origin" only.  *Id.*  He alleged that the earliest the discrimination took place was November 1, 2007, and the latest was April 5, 2011; and he checked the box for "Continuing Action."  *Id.*  His amended charge contained the following allegations:

> I began working for Clifton Gunderson, LLP (Respondent) on December 18, 2006, as a full-time Staff Accountant.  In the spring of 2010, I complained to a former supervisor that I felt my Manager (ED) was treating me differently due to my National Origin; however, nothing was ever done to reso[v]le the issue and the treatment has continued to date.  This treatment by ED includes but is not limited to, being passed on promotions and other opportunities to grow with the company, being segregated, failing to communicate with me, questioning my decision making, and treating me with little or no respect.  This situation has created a hostile work environment and has made the work place difficult to work in.
>
> I believe I am being discriminated against due to my National Origin (Romanian), in violation of Title VII of the Civil Rights Act of 1964, as amended.
>
> In addition, I believe others have been discriminated against due to their National Origins, in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id.*

After he filed his charge, Plaintiff was completely ostracized and shunned by the management of the Albuquerque Office, which became aggressive and hostile with him.  Compl. (ECF No. 1) ¶ 15.  On or around May 15, 2011, Plaintiff was forced to resign from Defendant because of the hostile work environment.  *See id.* ¶ 16; Pl.'s Resp., Ex. A (ECF No. 16) at 9 of 11.

On May 27, 2011, Defendant submitted to the EEOC its response to the Charge of

Discrimination.  *See* Pl.'s Resp., Ex. B (ECF No. 16) at 8-11 of 11.  In its response, Defendant noted, among other things, that Plaintiff submitted an "Initial Statement" to Defendant three weeks after his initial charge that rambles on for seven pages.  *Id.*, Ex. B (ECF No. 16) at 8 of 11.  Although Defendant asserts that the Initial Statement lacks substance and supporting evidence, making the allegations difficult to rebut, Defendant proceeds in its response letter to point out the absences of substance and deny the charges.  *Id.*, Ex. B (ECF No. 16) at 8-9 of 11.  Significantly, Defendant explains in detail how Plaintiff resigned abruptly from Defendant after taking a new position, and concludes that "[t]here is and could not be any claim of constructive discharge by Mr. Mangu."  *Id.*, Ex. B (ECF No. 16) at 9 of 11.

On February 26, 2013, Plaintiff filed suit against Defendant for discrimination on the basis of his national origin in violation of Title VII and the New Mexico Human Rights Act ("NMHRA").  Compl. (ECF No. 1) ¶ 20.  He further alleges that Defendant "discriminated against Plaintiff by denying him promotional opportunities, subjecting him to a hostile work environment and forcing him to resign."  *Id.* ¶ 21.  Plaintiff contends he has suffered damages "as a result of Defendant's retaliatory practices."  *Id.* ¶ 23.

## II.    MOTION TO COMPEL ARBITRATION

### A.    Standard

The Federal Arbitration Act ("FAA") provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . *shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract*.

9 U.S.C. § 2 (emphasis added).  Arbitration agreements may thus be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. *Rent-A-Center, West,*

*Inc. v. Jackson*, __ U.S. __, 130 S.Ct. 2772, 2776 (2010).

Congress's purpose in enacting the FAA was "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).  The FAA thus "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).

The FAA "provides two parallel devices for enforcing an arbitration agreement:  a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 22.  Under Section 4 of the FAA, a court may order the parties to arbitrate "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."  9 U.S.C. § 4.  A court should only decide as a matter of law whether the parties entered into an agreement to arbitrate when there is no genuine issue of material fact concerning the formation of the agreement.  *See Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997); *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980).

In enacting the FAA, Congress did not intend to force parties to arbitrate in the absence of an agreement, and therefore the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked."  *Avedon*, 126 F.3d at 1286-87. When the parties dispute the existence of a valid arbitration agreement, the presumption in favor of arbitration disappears.  *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.

2002).   Consequently, a federal court looks to state law principles of contract formation to determine whether an agreement to arbitrate had been reached:

> In applying state law, [a] court may not . . . construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.   However, it is only when [a] state-law principle . . . takes its meaning precisely from the fact that a contract to arbitrate is at issue that the state law will be preempted by the FAA.

*Avedon*, 126 F.3d at 1287 (internal quotations and citations omitted).   Thus, courts generally apply state law on the formation of contracts to determine whether a party agreed to arbitrate a dispute.   *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006).

**B.**   **Analysis**

The first question for the Court is which state's law applies.   Defendant contends that a choice of law provision in the Employment Agreement dictates that Illinois law, not New Mexico law, applies.

**1.**   **Choice of Law**

"The federal court is required to follow the conflicts of laws rules prevailing in the forum state."   *Loveridge v. Dreagoux*, 678 F.2d 870, 877 (10th Cir. 1982).   New Mexico recognizes that parties may choose through a contractual choice-of-law provision the law to be applied to a particular dispute.   *Fiser v. Dell Computer Corp.*, 2008-NMSC-046, ¶ 7, 188 P.3d 1215.   "If the law of a foreign jurisdiction governs, then we look to whether its application would offend a tenet of New Mexico public policy."   *Flemma v. Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 12, 2013 WL 2353832 (No. 33,353, May 30, 2013).   If the application of the foreign law would offend New Mexico public policy, then courts apply New Mexico law.   *Id.* The question here is whether enforcing the arbitration agreement under Illinois law, as contracted by the parties, would offend New Mexico public policy.   *See id.*

6

Defendant relies in part on the case of *Flemma v. Halliburton Energy Servs., Inc*., 2012-NMCA-009, 269 P.3d 931 (2011). That case, however, was overruled by the New Mexico Supreme Court in *Flemma v. Halliburton Energy Servs., Inc*., 2013-NMSC-022, ¶ 12. The New Mexico Supreme Court declined to apply Texas law to enforce a Texas agreement, holding that the agreement was unconscionable under New Mexico law, and thus, it violated New Mexico public policy. *See id.* ¶¶ 19, 25. Accordingly, in light of the New Mexico Supreme Court's decision in *Flemma*, to determine whether to apply Illinois or New Mexico law, this Court will first look to whether the Arbitration Clause in the Employment Agreement is unconscionable under New Mexico law.

### 2.    New Mexico Law on Unconscionability

Unconscionability is an equitable doctrine that allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party. *Rivera v. American Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 43, 259 P.3d 803. Unconscionability is analyzed from both substantive and procedural perspectives. *Id.* A contract may be rendered unenforceable under either substantive or procedural unconscionability, or a combination of both. *Id.* ¶ 47. The two perspectives have an inverse relationship: "[t]he more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." *Cordova v. World Finance Corp. of New Mexico*, 2009-NMSC-021, ¶ 24, 208 P.3d 901. The party seeking to set aside an arbitration agreement on unconscionability grounds has the burden of persuasion. *See*, *e.g.*, *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 277 (3d Cir. 2004) ("[T]he burden of proving such unconscionability lies with the party challenging the contract provision."); *Strausberg v. Laurel Healthcare Providers, LLC*,

__-NMSC-__, No. 33,331, slip op. at 2 (June 27, 2013) (holding that party asserting arbitration agreement is unconscionable has burden to prove unconscionability because it is an affirmative defense to contract enforcement).

Substantive unconscionability focuses on the legality and fairness of the contract terms, including concerns such as the commercial reasonableness and fairness of the terms, the purpose and effect of the terms, and the one-sidedness of the terms. *Rivera*, 2011-NMSC-033, ¶ 45. A contract term is substantively unconscionable if it is "grossly unreasonable" and against public policy. *Id.* (quoting *Cordova*, 2009-NMSC-021, ¶¶ 22, 31). In other words, contract terms that "unreasonably benefit one party over another are substantively unconscionable." *Id.* ¶ 46 (quoting *Cordova*, 2009-NMSC-021, ¶ 25). Courts are to determine whether one-sided terms render an arbitration clause unenforceable on a case-by-case basis. *Bargman v. Skilled Healthcare Group, Inc.*, 2013-NMCA-006, ¶ 17, 292 P.3d 1 (2012), *cert. granted*, 299 P.3d 423.

In *Cordova v. World Finance Corp.*, 2009-NMSC-021, the New Mexico Supreme Court voided an inherently one-sided form arbitration provision used by a small loan company that limited a borrower to mandatory arbitration as a forum to settle all disputes, while reserving for the lender the exclusive option of access to the courts for all remedies the lender was "most likely" to seek against a borrower. *Id.* ¶ 1. In affirming the district court's refusal to uphold the arbitration agreement, the New Mexico Supreme Court described the one-sided arbitration provisions as "egregious" and explained:

> In all cases of default, which is the most likely reason for lenders to take action against their borrowers, it broadly reserved the option of availing itself directly of any and all "remedies in an action at law or in equity, including but not limited to, judicial foreclosure or repossession."
>
> In striking contrast, as one of [the lender]'s borrowers, Cordova had no rights under the form agreement to go to any court for any reason whatsoever . . . . It is highly unlikely that [the lender] will find itself at odds with the contractual

8

> terms of its own form agreements, or the circumstances of its lending or collection practices, or claim it was the victim of a fraudulent consumer scheme, or have any other reason to make a claim against its borrowers for violation of consumer protection laws.

*Id.* ¶¶ 26-27.   The court noted that it need not rely on any finding of procedural unconscionability because "the substantive unconscionability of these one-sided arbitration provisions is so compelling."  *Id.* ¶ 32.

Two years later, the New Mexico Supreme Court in *Rivera* again concluded that a form arbitration agreement was unconscionable.  2011-NMSC-033, ¶ 54.  In *Rivera*, the form car title loan used by the title loan lender contained an arbitration agreement that encompassed "any and all claims" that the borrower could conceivably have against the lender.  *Id.* ¶ 3.  The arbitration provisions, however, exempted from arbitration certain claims that the lender might have against the borrower.  *Id.*   Although not necessary to its decision, the New Mexico Supreme Court reached the unconscionability issue in order to "correct the Court of Appeals' overly narrow construction of [the New Mexico Supreme Court's] holding in *Cordova*."  *See id.* ¶¶ 10, 40.  The New Mexico Supreme Court clarified that "unfairly one-sided contract provisions" are unconscionable.  *See id.* ¶ 49.  It rejected the Court of Appeals' reasons for its conclusion that the lender reasonably exempted judicial foreclosure and repossession from claims covered by arbitration, noting that arbitrators have broad powers to resolve statutory claims and claims involving a lender's security interest in collateral.  *See id.* ¶¶ 51-52.  The New Mexico Supreme Court instead held:

> By excepting foreclosure and repossession from arbitration, American General retained the right to obtain through the judicial system the only remedies it was likely to need. . . . American General's ability under the arbitration clause to seek judicial redress of its likeliest claims while forcing Rivera to arbitrate any claim she may have is unreasonably one-sided.

*Id*. ¶ 53.  It therefore concluded that the arbitration provisions were "unfairly one-sided and void

under New Mexico law." *Id.* ¶ 54.

The New Mexico Court of Appeals followed *Cordova* and *Rivera* in concluding that the plain terms of a nursing home arbitration agreement were enough evidence to find it unconscionable because "common sense" dictates that the exempted claims were those a nursing home was most likely to pursue, and conversely, the claims subject to arbitration were those most likely that a resident would pursue. *See Figueroa v. THI of New Mexico at Casa Arena Blanca LLC*, No. 30,477, slip op. at 25 (N.M.Ct.App. July 18, 2012), *cert denied*, No. 33,762, 297 P.3d 332 (N.M. Oct. 3, 2012). The Court of Appeals recognized that the arbitration agreement could be construed to grant some rights to a judicial forum to the resident, unlike in *Cordova* and *Rivera*, but nonetheless concluded that the rights did not sufficiently act to remedy the gross disparity that resulted from the nursing home's reservation of its most likely claims to a judicial forum, while the resident's most likely claims were subject to arbitration. *Id.*, slip op. at 22.

The provision at issue here is not even facially neutral. Instead, Defendant chooses, after the dispute arises, whether its employee's claims may proceed in court or in arbitration. Defendant may pursue any claim it has in court. This provision is more unreasonably one-sided than the provisions found unconscionable in *Cordova*, *Rivera*, and *Figueroa*. Consequently, under New Mexico law, the Arbitration Clause in the Employment Agreement is substantively unconscionable and enforcing it would be contrary to New Mexico public policy. The Court therefore cannot enforce the Arbitration Clause under Illinois law and will thus deny Defendant's motion to compel arbitration.

## III.   MOTION TO DISMISS

### A.   Standard

Defendant's motion is brought under Federal Rule of Civil Procedure 12(b)(1), based on a lack of subject matter jurisdiction.  At issue is whether or not Plaintiff has exhausted his administrative remedies, a jurisdictional prerequisite to bringing claims of employment discrimination under Title VII.  *See Shikles v. Sprint/United Management Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005).  The determination of exhaustion of administrative remedies is not an aspect of a substantive claim of discrimination.  *See Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1296 (10th Cir. 2003) (citing *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1325 (10th Cir. 2002)).  Consequently, this Court has wide discretion to consider documents outside the complaint to resolve disputed jurisdictional facts under Rule 12(b)(1).  *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  The Court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.  *Id.*

### B.     Analysis

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharge[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  As noted above, Title VII claims must be administratively exhausted before being brought in federal court.  To exhaust administrative remedies, an individual claimant must (i) timely file a charge of discrimination with the EEOC, setting forth the facts and nature of the charge; and (ii) receive notice of the right to sue.  *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999); 42 U.S.C. § 2000e-5(b), (c), (e), (f)(1).  Exhaustion of administrative remedies serves two important policy goals of the statute:  (1) it puts an employer on notice of a violation prior to the commencement of judicial proceedings; and (2) it facilitates

internal resolution of the issue rather than promoting costly and time-consuming litigation.  *See Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).

"A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).  The Tenth Circuit "liberally construe[s] charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007).  "This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel." *Mitchell v. City and County of Denver*, 112 Fed.Appx. 662, 667 (10th Cir. 2004).  "[T]he charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim . . . ." *Jones*, 502 F.3d at 1186.

It is undisputed that Plaintiff filed his EEOC Charge of Discrimination and that Plaintiff has exhausted his claim for discrimination based on national origin.  The question here is whether Plaintiff has exhausted his administrative remedies as to his retaliation and constructive discharge claims.  That issue first requires determining the scope of the allegations raised in his EEOC charge because "[a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *MacKenzie*, 414 F.3d at 1274.

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002).  "[E]ach discrete incident" of alleged discrimination or retaliation "constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Martinez*, 347

F.3d at 1210 (quoting *Morgan*, 536 U.S. at 110-13).  As Defendant correctly argues, any adverse employment actions occurring after Plaintiff submitted his amended administrative charge on May 11, 2011, would not fall within the scope of his charge.  *Jones,* 502 F.3d at 1186.  If a plaintiff wishes to sue for retaliation and constructive discharge that occurred as a result of filing his first EEOC charge, he must exhaust his administrative remedies with respect to this allegation.  *See Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005).  *See also Chapman v. Carmike Cinemas*, 307 Fed. Appx. 164, 174 (10th Cir. Jan. 12, 2009) (unpublished decision) ("[W]hen the constructive discharge is complete-i.e., when the employee resigns-the discharge is most akin to a wrongful discharge by the employer, which is a discrete and identifiable act.  Accordingly, we conclude that a claim of constructive discharge requires filing an administrative charge.") (internal citations omitted).  The rationale for this position is that "an act which occurs subsequent to the filing of the formal EEOC charge would not be included in the scope of the administrative investigation and would constitute its own unlawful employment practice for which administrative remedies must be exhausted." *Gerald v. Locksley*, 849 F.Supp.2d 1190, 1216-17 (D.N.M. 2011) (internal citations omitted).

In this case, Plaintiff only checked the box for "National Origin" discrimination, leaving the "Retaliation" box unmarked. The failure to mark the box for "Retaliation" creates a presumption that Plaintiff was not asserting retaliation claims.  *See Jones*, 507 F.3d at 1186 ("The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box.").  Although a plaintiff may rebut the presumption if the text of the charge clearly sets forth the basis of the claim, *see id.*, here the facts set forth in the Charge of Discrimination do not discuss or otherwise support a claim for retaliation or constructive discharge.  The facts describe only acts contributing to a hostile work environment;

nowhere is retaliation or constructive discharge mentioned or even alluded to.  Moreover, the dates of discrimination Plaintiff alleges in the Charge of Discrimination are from November 1, 2007, through April 5, 2011.  It is undisputed that Plaintiff resigned on May 15, 2011, after he submitted his initial Charge of Discrimination and his amended charge, and after the alleged period of discrimination.  An investigation into whether Defendant retaliated against Plaintiff and/or constructively discharged him cannot reasonably be expected to follow from the charge alone.  *Cf. Jones*, 502 F.3d at 1187 (concluding that failure-to-accommodate claim was not within scope of administrative charge where charge failed to allege any facts related to defendant's failure to consider accommodating his disability).

Plaintiff nonetheless argues that the Court may look beyond the charge itself and to supplements filed with the EEOC to determine whether the twin goals of exhaustion – notice to the employer of the charges against it and the opportunity to resolve all charges through conciliation – were met.  Plaintiff asks the Court to consider the following additional information submitted to the EEOC:  (i) an email by Plaintiff attaching his resignation letter, *see* Pl.'s Resp., Ex. A (ECF No. 16) at 6 of 11; (ii) a copy of his resignation letter, *see id.*, Ex. A (ECF No. 16) at 7 of 11; and (iii) the response letter by Defendant to Plaintiff's charge, *see id.*, Ex. A (ECF No. 16) at 8-11 of 11.  As to the email and resignation letter, Plaintiff's evidence to the Court does not establish that Plaintiff sent them to the EEOC.  The email has a blank space in the "To:" line and the body of the email does not indicate to whom Plaintiff was sending the email.  Similarly, the resignation letter is a stand-alone document addressed to Defendant, not the EEOC.  Plaintiff has not submitted an affidavit to establish the foundation for the email or resignation letter. Without proof in the record that the EEOC was in receipt of the email or letter, the Court is unable to accept representations of counsel as being probative in this matter.  For these reasons,

the Court does not consider either the email or resignation letter as containing any substantive proof, for purposes of Defendant's motion, as to what the EEOC had before it.  The Court, however, will consider Defendant's response letter to the EEOC.  The response letter itself is addressed to the EEOC regarding Plaintiff's EEOC charge, and Defendant does not dispute that it sent this response letter to the EEOC.  The Court will thus consider whether the response letter is sufficient evidence to conclude that Plaintiff exhausted his administrative remedies on the constructive discharge and retaliation claims.

Essentially, Plaintiff argues that, despite the deficiencies of the charge itself, the Court should look to the administrative investigation that did occur.  According to the contents of the response letter, Plaintiff submitted a seven-page "Initial Statement" to Defendant as part of the EEOC process.  *See* Pl.'s Resp., Ex. B (ECF No. 16) at 8 of 11.  Additional allegations made by Plaintiff during the course of the EEOC investigation may be considered by the Court in determining the sufficiency of the charge.  *See Annett v. University of Kansas*, 371 F.3d 1233, 1238 (10th Cir. 2004) (considering both plaintiff's charge of discrimination and complaint narrative); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260 (10th Cir. 1998) (considering plaintiff's supplement to her charge of discrimination); *Gerald v. Locksley*, 849 F.Supp.2d 1190, 1214 (D.N.M. 2011) ("Liberally construing EEOC complaints requires courts to look beyond the formalities of the complaint form.").  *See also* 29 C.F.R. § 1601.12(b) ("A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein.").  Although Plaintiff's statement is not part of the Court's record, the contents of the statement prompted Defendant in its response letter to address and refute "any claim of constructive discharge by Mr. Mangu."  Pl.'s Resp., Ex. B (ECF No. 16) at 9 of 11.  Consequently, during the course of the EEOC investigation of

15

Plaintiff's national origin discrimination charge, Defendant had notice of Plaintiff's constructive discharge and retaliation claims and the EEOC had an opportunity to investigate and conciliate those claims.  Plaintiff's additional allegations, and Defendant's response, should reasonably have led to an investigation of his constructive discharge and retaliation claims.

Defendant relies on the case of *Chapman v. Carmike Cinemas*, 307 Fed. Appx. 164 (10th Cir. 2009), to support its position that Plaintiff failed to include a constructive discharge claim in his EEOC charge.  As in *Chapman*, this Court recognizes that a constructive discharge claim is a discrete act requiring its own administrative charge.  *See id.* at 174.  *Chapman*, however, recognizes that a plaintiff may file a new administrative charge or amend a charge of discrimination to include it.  *See id.* at 167-68.  The plaintiff in *Chapman* filed her formal charge in October 2004, quit her employment in May 2005, but never amended her charge of discrimination or filed a new charge to allege constructive discharge.  *See id.* at 167.  In contrast, here Plaintiff asserted a claim of constructive discharge in his Initial Statement to Defendant within weeks of filing his initial charge of discrimination, while the EEOC process was ongoing. Defendant responded to the claim in its correspondence to the EEOC, showing it had notice of the claim and giving the EEOC an opportunity to investigate the claim.

The case of *Gunnell v. Utah Valley State College* is more on point and supports this Court's conclusion that Plaintiff exhausted his administrative remedies.  In *Gunnell*, the plaintiff filed a notice of discrimination in September 1993 for retaliation with the Utah Anti-Discrimination Division ("UADD").  *Gunnell*, 152 F.3d at 1257.  In November 1993, the plaintiff submitted to the UADD a supplement to her charge of discrimination alleging sexual harassment.  *Id.* at 1258.  In holding that the plaintiff sufficiently exhausted her sexual harassment claim, the Tenth Circuit reasoned as follows:

While we do not construe Gunnell's September UADD/EEOC charge as alleging more than a retaliation claim, her November supplement to her charge presented a sufficient claim of sexual harassment. As to Gunnell's September claim, we note that Gunnell marked only the "retaliation" box on her administrative complaint. Although her failure to mark the box for sex discrimination is not dispositive, . . . , it certainly creates a presumption that she was not asserting claims represented by boxes not checked. Here, that presumption was not rebutted by the text of her claim because the prose she used to describe her claim did not clearly set forth a sexual discrimination claim. A reasonable reader would understand that her mention of sex discrimination was merely a prelude, an explanation leading up to the gist of her complaint of retaliation. . . . However, Gunnell's November 9 supplement to her charge does complain about Clark's harassment. The allegation in the supplement, though sparse, identifies the type of discrimination complained of, the alleged harasser, and an approximate time period, and thus is minimally sufficient to satisfy the requirements for the contents of a charge of discrimination and the purposes of the notice requirement. *See* 42 U.S.C. § 2000e-5(b); 29 C.F.R. § 1601.12(b); *see also Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir.1994) (purpose of requiring administrative exhaustion is to give notice of alleged violation to charged party and to give EEOC an opportunity to conciliate the claim). Moreover, although UVSC argues that there is nothing in the record to show that Gunnell filed the supplement with the UADD, Gunnell's affidavit asserted that she filed the supplementary complaint. Consequently, there was evidence before the district court that a timely complaint alleging sexual harassment had been filed with the UADD, making the matter inappropriate for summary judgment on this ground.

*Id.* at 1260.

As in *Gunnell*, here Plaintiff supplemented the allegations in his charge during the course of the administrative agency's investigative procedures, identifying his constructive discharge claim sufficiently for Defendant to defend against it. The EEOC had the constructive discharge issue before it. Under these circumstances, where the purposes of exhaustion have been met, the Court will not bar Plaintiff's suit for constructive discharge and retaliation. *See id.*; *Davis v. Sodexho, Cumberland College Cafet*eria, 157 F.3d 460, 463 (6th Cir. 1998) ("When the EEOC investigation of one charge *in fact* reveals evidence of a different type of discrimination against the plaintiff, a lawsuit based on the newly understood claim will not be barred. . . . Similarly, where facts related with respect to the charged claim would prompt the EEOC to investigate a

17

different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim."); *Daily v. American Founders Bank, Inc.*, 667 F.Supp.2d 728, 734-35 (E.D. Ky. 2009) (concluding that plaintiff exhausted sex discrimination claim, even though she did not mention sex discrimination in her charge and there was no evidence that EEOC actually conducted such an investigation, because plaintiff provided sufficient information regarding sex discrimination during her EEOC interview, which should have prompted the EEOC to investigate her sex discrimination claim).

 **IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss and to Compel Arbitration (**ECF No. 10**) is **DENIED.**

_____

 **SENIOR UNITED STATES DISTRICT JUDGE**