## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

JOHNNY I. MANGU,

      Plaintiff,

v.                                                                                    No. Civ. 13-187 LH/CG

CLIFTON GUNDERSON, LLP,
*also known as* CLIFTON LARSON ALLEN LLP,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Clifton Gunderson, LLP's Motion for Summary Judgment. (ECF No. 43) The Court, having reviewed the motion, briefs, evidence in the record, relevant law, and otherwise being fully advised, concludes that the motion is well taken and shall be **granted**. **The Court hereby enters summary judgment in favor of Defendant on Plaintiff's failure-to-promote, constructive discharge and hostile work environment claims. These claims are dismissed with prejudice.**

Because Defendant did not move for summary judgment on Plaintiff's retaliation claim, that claim remains in this lawsuit. The Court will consider summary judgment on Plaintiff's retaliation claim pursuant to its authority under Fed. R. Civ. P. 56(f), which permits the Court to grant summary judgment, if appropriate, independently of Defendant's motion after giving notice and a reasonable time to respond. **As set forth in detail in Section C(4) of this opinion, the Court orders the parties to respond to this Court's stated intention to consider granting summary judgment on Plaintiff's retaliation claim no later than July 13, 2015.** Each party

is directed to set forth any ground, legal or factual, in support or in opposition to the entry of summary judgment on Plaintiff's retaliation claim.

## A. BACKGROUND

Plaintiff Johnny Mangu alleges in this lawsuit that his former employer, Defendant Clifton Gunderson, LLP, discriminated against him on the basis of his Romanian national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New Mexico Human Rights Act ("NMHRA"), N.M. Stat. Ann. § 28-1-7 (2004). (Compl., ECF No. 1) Plaintiff has asserted four claims in this employment discrimination lawsuit: failure-to-promote, hostile work environment, constructive discharge, and retaliation. (Compl. ¶¶ 21, 23) Defendant has moved for summary judgment on three of these claims: failure-to-promote, hostile work environment, and constructive discharge. (Mot. Summ. J. at 1, ECF No. 43)

### 1. Factual Background[1]

Defendant is a national accounting firm with an office in Albuquerque, New Mexico.[2] (Emilie Deveraux Aff. ("Deveraux Aff"), ¶ 1, ECF No. 43-7) Plaintiff identifies his national origin as Romanian. (Compl. at 2, ECF No. 1) Plaintiff was employed by Defendant as a Staff Accountant in its Albuquerque office for approximately four years, from April 1, 2007, until his resignation on May 16, 2011. (Deveraux Aff. ¶ 2) The position immediately above the Staff Accountant position held by Plaintiff was that of Senior Accountant. (*Id.* ¶ 2) It is undisputed by

---

[1] Except as otherwise noted, the following asserted facts are undisputed.

[2] In 2012, Defendant merged with another accounting firm to become CliftonLarsonAllen LLP. (Deveraux Aff. ¶ 1)

the parties that Plaintiff sought a promotion to the Senior Accountant position,[3] but was not promoted and remained a Staff Accountant throughout his tenure with the company.

A central issue in this lawsuit is Defendant's decision not to promote Plaintiff to the Senior Accountant position. Emilie Deveraux, one of Defendant's employees in the Albuquerque office,[4] was in Plaintiff's direct line of supervision and was the individual who made the decision not to promote Plaintiff. (*Id.* ¶ 4) Ms. Deveraux stated in her affidavit that she did not promote Plaintiff to the Senior Accountant position in 2010 due to the results of his last annual performance review. (Deveraux Aff. ¶ 9) This annual performance review was completed on June 3, 2010 by Laura Lewis, Plaintiff's immediate supervisor at the time. (ECF Nos. 43-11 and 43-12; Lewis Dep. 33:4-7, 33:18-21, May 1, 2014, ECF No. 43-10) The review consisted of an evaluation of Plaintiff's job performance in several areas. (*Id.*) Although Ms. Lewis rated Plaintiff as meeting, exceeding, or performing at above expectations in certain areas, she assessed Plaintiff as "need[ing] improvement" in the areas of communication, leadership, and technical expertise. (ECF No. 43-11 at 2, 5; ECF No. 43-12 at 2; *see also* Lewis Dep., 32:11-33:21) She also rated Plaintiff as "need[ing] improvement" in completing two fiscal year goals that had been set for him one year earlier. (ECF No. 43-12 at 2, 3; Lewis Dep. 33:13-21) Overall, Ms. Lewis gave Plaintiff a final assessment rating of "Meets Expectations."[5] (ECF No. 43-12 at 4) In deciding against promoting Plaintiff to the Senior Accountant position, Ms. Deveraux

---

[3] The summary judgment record offers little by way of pertinent factual details regarding Defendant's general promotion policies and procedures, and more specifically, the process that was undertaken in relation to the promotion that Plaintiff sought. For example, neither party states how Plaintiff sought the promotion to the Senior Accountant position (i.e., whether there was a formal application process), what qualifications were required for the Senior Accountant position, or the company's selection process.

[4] It is not clear from the record what position Ms. Deveraux held with the company.

[5] Plaintiff alleges that the review conducted by Ms. Lewis was problematic for a number of reasons. (Pl.'s Resp. at 3-4) The Court will address Plaintiff's specific factual allegations related to the 2010 annual review, as necessary, in its analysis.

stated that she specifically relied upon Ms. Lewis's assessment that Plaintiff needed improvement in the areas of communication, leadership, technical expertise and the "progress made toward achieving the goal set for him the year before to understand the information in the tables used regularly to an advanced level." (Deveraux Aff. ¶ 9)

Although the exact timing is not entirely clear from the record, Ms. Deveraux made the decision to not promote Plaintiff sometime after June 13, 2010. (Deveraux Aff. ¶ 9) From this date until May 16, 2011 (the date that Plaintiff resigned from his position), the parties agree that two Staff Accountants under Ms. Deveraux's supervision were promoted to the Senior Accountant position: Gabriel Garcia and Marco Rangel. (*Id.* ¶ 8; Pl.'s Dep. 79:2-21, Apr. 2, 2014, ECF No. 49) Although Defendant maintains that Mr. Garcia and Mr. Rangel were the only staff accountants promoted during this time period, Plaintiff asserts that Angelica Madrid was also promoted to the Senior Accountant position following the June 2010 annual performance review period. (Deveraux Aff. ¶ 8; Pl.'s Dep. 79:2-21) The parties also dispute whether a fourth employee, Natasha Arnold, was promoted to the Senior Accountant position.[6] (Mot. Summ. J. at 3; Pl.'s Resp. at 3)

Plaintiff alleges that Ms. Deveraux did not promote him to the Senior Accountant position on the basis of his Romanian national origin. (ECF No. 43-5 at 4) The parties, however, dispute whether Ms. Deveraux had actual or constructive knowledge of Plaintiff's Romanian national origin.[7] Plaintiff asserts that the three employees he claims were promoted—Ms. Madrid, Mr. Garcia, and Mr. Rangel—were all United States citizens, had "Hispanic

---

[6] Defendant claims that Ms. Arnold was promoted from the position of Staff Accountant to Senior Accountant. (Deveraux Aff. ¶ 7) Defendant does not state when this promotion occurred. (*Id.*) Plaintiff, however, asserts that Natasha Arnold worked in Defendant's Human Resources department and was never promoted to a Senior Accountant position. (Pl. Aff. ¶ 3)

[7] The Court will set forth in its analysis the parties' specific assertions regarding Ms. Deveraux's knowledge, or lack thereof, of Plaintiff's national origin.

backgrounds" (Mr. Garcia), and did not speak with accents (Ms. Madrid, Mr. Garcia). (Pl.'s Dep. 79:22-24, 80:12-14, 21-23) Defendant claims that Ms. Arnold was born in Columbia, South America, and that Ms. Deveraux was aware of Ms. Arnold's national origin when she promoted her to the Senior Accountant position. (Deveraux Aff. ¶ 8) Defendant also asserts that Ms. Deveraux did not know the birthplace of either Mr. Rangel or Mr. Garcia, but that she "recognized both as having Hispanic national origins." (*Id.* ¶ 8)

After he did not get promoted to the Senior Accountant position, Plaintiff sought other outside employment opportunities. On March 31, 2011, he received a job offer from Accounting & Consulting Group, LLP. (ECF No. 43-3) After agreeing upon a start date of May 16, 2011, Plaintiff signed a written offer of employment with the company on April 6, 2011. (*Id.*; ECF No. 43-2 at 11-14) The next day, April 7, 2011, Plaintiff met with Defendant's human resources representative Melody Zorgdrager and reported that Ms. Deveraux had discriminated against him due to his national origin. (ECF No. 43-4; Saundra Beatty Aff., ¶ 1, ECF No. 43-6) Ms. Zorgdrager asked Plaintiff to submit a written statement of his claim, which Plaintiff submitted via email on April 29, 2011. (ECF No. 43-4) During this interim period between his meeting with Ms. Zorgdrager and his submission of the written statement, Plaintiff also filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the New Mexico Human Rights Bureau (NMHRB) on April 9, 2011, alleging that Defendant had discriminated against him on the basis of his national origin. (ECF No. 43-3 at 5) Plaintiff indicated therein that the alleged discrimination he faced was a continuing action, with the earliest date of discrimination occurring on November 1, 2007, and the latest occurring on April 5, 2011. (*Id.*)

After filing his charge of discrimination, Plaintiff alleges that he noticed that Ms. Deveraux "was walking behind [him] at least . . . five to ten times, which was very unnatural" for her to do. (Pl.'s Dep. 161:25 – 162:1-11) Plaintiff claims that Ms. Deveraux would brush up against the back of his chair, and by the time he saw her, she'd move back. (*Id.*) Ms. Deveraux disputes this assertion, stating that she never walked behind Plaintiff except as needed to "direct and manage his work performance and that of any co-workers around him." (Deveraux Aff. ¶ 13) In addition, Plaintiff claims that after he informed his coworkers that he had complained about his treatment by Ms. Deveraux, an African-American coworker, Virgil Jackson, told him "Why are you complaining? . . . [Y]ou should take it, just because [Ms. Deveraux] doesn't like you." (Pl.'s Dep. 161:14-19) Plaintiff also alleges that he felt that he was in personal danger from Ms. Deveraux and that she might "snap" at him due to his observation of Ms. Deveraux's behavior at an office holiday party[8] where she had been "verbally abusive to her husband and had yelled at her stepchild (Pl.'s Dep. 175:9-18) as well as comments from co-workers that she was "unhappy about her personal life." (Pl.'s Dep. 178:6-9)

On Sunday evening, May 15, 2011, Plaintiff went to Defendant's offices in Albuquerque, cleaned out his desk, and emailed his letter of resignation effective immediately. (*Id.*) The next day, Plaintiff began his new employment with Accounting & Consulting Group.

## 2.  Procedural History

On February 26, 2013, Plaintiff filed suit against Defendant for discrimination on the basis of his national origin in violation of Title VII and the NMHRA. (Compl. ¶ 20) Plaintiff specifically alleged that Defendant "discriminated against Plaintiff by denying him promotional opportunities, subjecting him to a hostile work environment and forcing him to resign." (*Id.* ¶ 21)

---

[8] Plaintiff could not recall the year that this Christmas party occurred. (Pl. Dep. 178:21-24)

Plaintiff further claimed that he suffered damages "as a result of Defendant's retaliatory practices." (*Id.* ¶ 23)

Defendant subsequently moved to dismiss Plaintiff's retaliation and constructive discharge claims for failure to exhaust administrative remedies. (ECF No. 10) Defendant also sought an order compelling arbitration on all remaining claims. (ECF No. 10) The Court denied Defendant's motion, finding that Plaintiff had exhausted his administrative remedies with respect to the retaliation and constructive discharge claims. (Mem. Op. and Order at 11-18, ECF No. 19) In addition, the Court denied Defendant's request for arbitration. (*Id.*) Thereafter, Defendant filed an answer to Plaintiff's complaint and asserted a counterclaim against Plaintiff. (ECF No. 20) With regard to its counterclaim, Defendant stated that under the terms of the written employment agreement entered into between the parties, Defendant was entitled "to an award of the attorney fees, costs and expenses incurred in successfully defending all or part of the instant lawsuit." (*Id.*)

On June 20, 2014, Defendant moved for summary judgment on what it referred to in its briefing as Plaintiff's "failure-to promote-claim" and "hostile-environment/constructive discharge" claims. (Mot. Summ. J. at 1) Although the parties' briefing on summary judgment includes facts associated with Plaintiff's retaliation claim, Defendant did not raise any argument regarding the retaliation claim in its motion for summary judgment. (*Id.*) Consequently, the Court's analysis in this opinion is limited to the three claims directly addressed in Defendant's motion: (1) failure to promote, (2) hostile work environment, and (3) constructive discharge.

## B.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

## C. ANALYSIS

Under Title VII, it is an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, Section 28-1-7(A) of the NMHRA provides that it is an "unlawful discriminatory practice for . . . an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of . . . [the person's] national origin." N.M. Stat. Ann. § 28-1-7(A). In considering NMHRA claims, New Mexico courts have relied upon federal civil rights adjudication of Title VII claims for guidance. *See Ocana v. Am. Furniture Co.*, 2004-

NMSC-018, ¶ 23, 135 N.M. 539, 91 P.3d 58; *see also Ulibarri v. State of New Mexico Corr. Acad.*, 2006-NMSC-009, ¶¶ 11-13, 139 N.M. 193, 131 P.3d 43.   Accordingly, the Court will consider Defendant's arguments as to Plaintiff's claims under Title VII and the NMHRA together.

**1.   Failure to Promote Claim under Title VII and the NMHRA**

Defendant initially contends that it is entitled to summary judgment on Plaintiff's failure to promote claim under Title VII and the NMHRA. (Mot. Summ. J. at 9-10) As noted earlier, Plaintiff alleges in this lawsuit that Defendant unlawfully discriminated against Plaintiff by failing to promote him to the Senior Accountant position on the basis of his Romanian national origin. Because Plaintiff relies upon circumstantial evidence,[9] the Court will evaluate Plaintiff's failure to promote claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under this familiar framework, a plaintiff must first establish a prima facie case of discrimination by showing that "(1) he is a member of a protected class; (2) he applied for and was qualified for the particular position; (3) he was not promoted despite his qualifications; and (4) the position was filled or remained open after he was rejected."[10] *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1306-07 (10th Cir. 2005); *see also*

---

[9] In his response, Plaintiff states that he is relying on circumstantial evidence to establish unlawful discrimination on his failure to promote claim. (Pl.'s Resp. at 13, 15-16) In addition, both parties agree that the appropriate analysis of this claim is under the three-part *McDonnell Douglas* framework. (Mot. Summ. J. at 9; Pl.'s Resp. at 13)

[10] The Court must note, as the Tenth Circuit has, that our circuit's case law has "sometimes articulated the prima facie case differently, particularly as to the fourth prong and whether it requires the plaintiff to show that the person promoted was outside of the protected class to which the plaintiff belongs." *See Jaramillo*, 427 F.3d at 1307 n.1. The Court need not, however, address this inconsistency because Defendant does not contest that Plaintiff has established a prima facie case. *See id.* (declining to address inconsistency because the parties were in agreement that the plaintiff had satisfied her burden of establishing a prima facie case of discrimination on the basis of failure to promote); (*See* Mot. Summ. J. at 9).

*Tran v. Sonic Indus. Servs., Inc.*, 490 F. App'x 115, 118 (10th Cir. 2012) (unpublished).[11] If the plaintiff establishes a prima facie case, then "a presumption of discrimination arises" resulting in the burden shifting "to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Jaramillo*, 427 F.3d at 1307. If the defendant-employer carries its burden of production, "the presumption of discrimination drops out of the case" and "the burden then shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination." *Id.*

Here, Defendant does not contest, and therefore, essentially concedes for purposes of its summary judgment motion that Plaintiff has established a prima facie case of discrimination. (Mot. Summ. J. at 9-10) Defendant instead directs its arguments to the latter two steps of the *McDonnell Douglas* framework. Defendant argues that it had a legitimate, non-discriminatory reason for its decision not to promote Plaintiff to the Senior Account position—namely, the "deficiencies identified" in Plaintiff's 2010 annual performance review conducted by Ms. Lewis. (Mot. Summ. J. at 10) Defendant also contends that Plaintiff is unable to proffer evidence of pretext because Ms. Deveraux did not know of Plaintiff's Romanian national origin until after she made the decision to not promote Plaintiff. (Mot. Summ. J. at 9-10) The Court's analysis is therefore "confined to the question whether [Defendant has] produced a legitimate, nondiscriminatory reason for its employment decision and, if so, whether [Plaintiff has] produced evidence sufficient to raise a genuine issue of material fact on the question of pretext." *Jaramillo*, 427 F.3d at 1307. As set forth more fully below, the Court concludes that Defendant has carried its burden, but Plaintiff has not.

---

[11] The Court relies upon *Tran* and other unpublished opinions in ruling on Defendant's motion for summary judgment. The Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. *See* 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").

a.  Legitimate, Nondiscriminatory Reason for Not Promoting Plaintiff

At the second stage of the *McDonnell Douglas* framework, Defendant must articulate a legitimate, nondiscriminatory for failing to promote Plaintiff to the Senior Accountant position. At this stage, Defendant is required only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII." *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003). Defendant does not "need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *EEOC v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 (10th Cir. 1992). Rather, Defendant's "burden at this stage is one of production, not one of persuasion." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).

Here, Defendant submits a single explanation for its decision to not promote Plaintiff to the Senior Accountant position—Ms. Deveraux's testimony that she decided not to promote Plaintiff due to his failure to meet certain performance expectations in the annual review of Plaintiff's job performance that was conducted by Ms. Lewis in June 2010. (Deveraux Aff. ¶ 9; *See* Mot. Summ. J. at 9-10) Ms. Deveraux states that she specifically relied upon Ms. Lewis's determination that Plaintiff "performed below expectations in four areas, giving him a 'Needs Improvement' rating in Communication, Leadership, Technical Expertise and the progress made toward achieving the goal set for him the year before 'to understand the information in the tables used regularly to an advanced level.'" (*Id.*) Because Defendant's proffered explanation is not "facially prohibited by Title VII," *Jones*, 349 F.3d at 1266, the Court concludes that Defendant has articulated a legitimate, nondiscriminatory reason for its decision to not promote Plaintiff to the Senior Accountant position. *See, e.g., Juarez-Galvan v. United Parcel Serv., Inc.*, 572 F. App'x 619, 622 n.4 (10th Cir. 2014) (poor performance by plaintiff during qualifying period was

a legitimate and non-discriminatory reason for adverse employment action taken by employer) (unpublished); *See Doyle v. Nordam Group, Inc.*, 492 F. App'x 846, 851 (10th Cir. 2012) ("A negative or even average performance review is obviously a legitimate factor any employer may consider in deciding whom to promote to a senior management position") (unpublished).

   b. <u>Pretext Analysis</u>

Because Defendant has articulated a legitimate, non-discriminatory reason for its refusal to promote Plaintiff—i.e., his failure to meet certain performance expectations in his 2010 annual review—the burden shifts back to Plaintiff under the third step of the *McDonnell Douglas* framework to "prove by a preponderance of the evidence" that Defendant's proffered reason was a pretext for unlawful national origin discrimination. *Jaramillo*, 427 F.3d at 1307. The majority of the parties' arguments on Plaintiff's failure-to-promote claim center on whether Plaintiff has produced evidence sufficient to raise a genuine issue of material fact on the question of pretext. (Mot. Summ. J. at 9-10; Pl.'s Resp. at 13-16)

An employee can "demonstrate[] pretext by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo*, 427 F.3d at 1308. The Tenth Circuit has stated that "[e]vidence of pretext may include prior treatment of [the employee]; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." *Id.* (quotation marks and citation omitted). Although evidence of pretext "may take a variety of forms," *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000), the Tenth Circuit has

indicated that one "typical method for a plaintiff to prove pretext is by providing direct evidence that the defendant's stated reason for the adverse employment action was false" or by making a "differential treatment argument" that the "employer treated the plaintiff differently from other similarly-situated employees . . . ." *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167-68 (10th Cir. 2007). "In making a pretext determination, a court looks at the facts as they appeared to the person making the employment decision, because it is the employer's perception that is relevant, not the employee's subjective evaluation of his own relative performance." *Martinez v. United States Dep't of Energy*, 170 F. App'x 517, 522 (10th Cir. 2006) (unpublished) (internal citation, quotation marks, and alterations omitted).

Here, Plaintiff makes a number of arguments as to why Defendant's proffered reason for failing to promote him—i.e., his performance on the 2010 annual review—was pretext for national origin discrimination. Before addressing Plaintiff's specific arguments regarding pretext, the Court initially considers Defendant's contention in its summary judgment motion that Plaintiff is precluded from asserting pretext because Ms. Deveraux did not have actual or constructive knowledge that Plaintiff was Romanian at the time she made the decision not to promote him to the Senior Accountant position. (Mot. Summ. J. at 9-10; Def.'s Reply at 2-6) Defendant specifically relies on Ms. Deveraux's affidavit testimony that she did not know, until after Plaintiff's resignation, where he "was born, what his national origin was, or that he was Romanian." (Deveraux Aff. ¶ 5) Ms. Deveraux further stated that "[i]t was rarely the case that [she] knew the birthplace of any of the Clifton Gunderson employees under [her] supervision." (*Id.* ¶ 6) Citing to *Rabinovitz v. Pena*, 89 F.3d 482 (7th Cir. 1996) and other out-of-circuit

authority, Defendant contends that "[p]roof than an employer did not know of a plaintiff's membership in a protected class would likely preclude any assertion of pretext." *Id.* at 488.[12]

In response to this argument, Plaintiff proffers evidence that he claims establishes Ms. Deveraux's knowledge of his Romanian national origin. Upon review, the Court determines that a majority of the evidence offered by Plaintiff does not give rise to a genuine issue of material fact regarding Ms. Deveraux's knowledge of his Romanian national origin.[13] Two arguments

---

[12] *Cf.* Larson, Employment Discrimination, Ch. 58, Title VII: National Origin Discrimination, § 58.03 (Matthew Bender):

> "[T]here may be national origin discrimination even though the employer does not know the particular national origin of the employee. It is enough if the employer is motivated by a general xenophobic prejudice against anyone who seems 'foreign.' . . . On the other hand, *if an employer truly does not know that the employee or applicant is a member of a protected national origin group, a prima facie case of disparate treatment based on national origin discrimination can not be made out.*" (emphasis added).

[13] Because the parties' argue at length regarding Ms. Deveraux's knowledge of Plaintiff's national origin, the Court will address the specific evidence proffered by Plaintiff that the Court determined did not give rise to a genuine issue of material fact. First, Plaintiff contends that Ms. Deveraux knew he was Romanian in light of "conversations being held in the office" and that Ms. Deveraux *may* have been present at a lunch meeting shortly after he was hired at which Plaintiff informed those present that he was Romanian. (Pl.'s Resp. at 2, 14; Pl.'s Dep. 14:14-19, 15:3-6) The Court finds these contentions to be nothing more than mere speculation and conjecture, which are inadequate to defeat a motion for summary judgment. *See, e.g.*, *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (stating that "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings[;] . . . evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

Second, Plaintiff states that Ms. Deveraux knew of his national origin because coworkers referred to him as "the Romanian" when he began working for Defendant. (Pl.'s Resp. at 13-14; Pl.'s Dep. 15:7-11) This, too, fails to create a genuine issue of fact because Plaintiff fails to point to any evidence indicating that Ms. Deveraux also referred to Plaintiff as "the Romanian" or that she was present when such a reference was made.

Third, Plaintiff relies on deposition testimony from two coworkers, both of whom stated that everyone at work knew of Plaintiff's Romanian national origin. (Pl.'s Resp. at 9; Changyi Feng Dep. 25:8-9, Apr. 2, 2014 (ECF No. 48-3); Faina Fialkovsky Dep. 8:4-7, Apr. 3, 2014 (ECF No. 51-5)) However, as Defendant points out, both coworkers admitted that they had no firsthand knowledge of what Ms. Deveraux specifically knew, as they had never been present at a time when Ms. Deveraux was told or said that she knew of Plaintiff's Romanian national origin. (Feng. Dep. 25:20-25; Fialkovsky Dep. 9:3-9)

Finally, Plaintiff claims that Ms. Deveraux knew he was Romanian because she was allegedly present at an internal human resources meeting regarding his EEOC complaint. (Pl.'s Resp. at 14) Defendant disputes whether Ms. Deveraux was present at the meeting. Nevertheless, the Court finds Plaintiff's assertion unavailing because the meeting occurred after Ms. Deveraux made the decision not to promote Plaintiff. The Court is concerned with Ms. Deveraux's knowledge of Plaintiff's national origin at the time of her decision, not at some point thereafter.

raised by Plaintiff, however, serve this purpose. First, Plaintiff maintains that his accent is "very distinguishable" and "so obvious" that "everyone [at work] knew he was not born in the United States." (Pl.'s Resp. at 14; Pl. Aff. ¶ 4) Plaintiff states in his affidavit that he had "countless work related conversations" with Ms. Deveraux during his employment (Pl. Aff. ¶ 5), thereby implying that Ms. Deveraux was personally aware of Plaintiff's accent and that, as a consequence, she knew he was Romanian or at the very least, that he was a foreigner. Defendant does not dispute Plaintiff's contention that Ms. Deveraux was familiar with Plaintiff's accent. Drawing all inferences in favor of Plaintiff as the non-moving party, the Court thinks that a reasonable jury could determine that Ms. Deveraux was aware that Plaintiff was of a different national origin based on his accent.[14] Second, the Court notes that it is undisputed that Plaintiff provided copies of his green card and naturalization application showing his Romanian citizenship to Defendant. (Pl.'s Dep. 12:20-13:24, Apr. 2, 2014, ECF No. 49) Again, drawing all inferences in favor of Plaintiff, a reasonable jury could determine that Ms. Deveraux was aware of Plaintiff's Romanian national origin based on Plaintiff's submission of these documents. The Court finds that there is a genuine issue of fact as to whether Ms. Deveraux was aware of Plaintiff's Romanian national origin. Because it is possible that a reasonable jury could conclude that Ms. Deveraux had knowledge of Plaintiff's national origin, the Court will proceed to consider Plaintiff's specific assertions of pretext:

- *Alleged Issues with Annual Performance Review Process*

    In arguing that Ms. Deveraux's proffered reason for not promoting him was pretext, Plaintiff points to a number of alleged deficiencies in the annual performance review conducted

---

[14] *See Baltazar v. Shinseki*, 485 F. App'x 941, 946 n. 4 (10th Cir. 2012) (unpublished) ("Evidence [plaintiff] spoke with an accent, however, may be relevant to her burden of proving she was terminated because of her national origin."); *See also* Larson, *supra* note 4 (stating that "there may be national origin discrimination even though the employer does not know the particular national origin of the employee.").

by Ms. Lewis: (1) the review was incomplete and limited in scope because Ms. Lewis did not supervise Plaintiff on all of his projects; (2) Ms. Lewis did not want to complete the review; and (3) Ms. Lewis's deposition testimony that it was difficult for her to manage Plaintiff's work as his supervisor because he was working on different projects than she was. (Pl.'s Dep. 84:2-14, 88:1-18; Lewis Dep. 33:18-23 (ECF No. 48-5)) Plaintiff also contends that it was implausible that the promotion decision was based on Ms. Lewis's review because Ms. Deveraux actually made promotion decisions six to ten months ahead of the evaluations. (Pl.'s Dep. 81:14-19; Pl.'s Resp. at 16)

The Court is not persuaded for a number of reasons. Initially, Plaintiff cannot demonstrate pretext by simply disagreeing with the accuracy or completeness of Ms. Lewis's evaluation of his job performance "because it is the employer's perception that is relevant, not the employee's subjective evaluation of his own relative performance." *Martinez*, 170 F. App'x at 522. As the Tenth Circuit has repeatedly affirmed, a plaintiff's "opinions about the fairness or accuracy of [an] evaluation is not evidence of pretext." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir.1999) (overruled on other grounds); *see also Juarez-Galvan*, 572 F. App'x at 622 (stating that the court "must generally defer to an employer's decisions on the quality of an employee's work, not the subjective beliefs of the affected employee."). Here, Ms. Lewis's perception was that there were deficiencies in certain areas of Plaintiff's work performance (i.e., leadership, communication, and technical expertise) and that he needed to improve his performance in these areas. While Plaintiff may have disagreed with this assessment, the Court must defer to Ms. Lewis's assessment of the quality of Plaintiff's work.

Moreover, the relevant inquiry in assessing pretext "is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and

acted in good faith upon those beliefs." *Swackhammer*, 493 F.3d at 1170 (internal citation omitted). Here, Ms. Deveraux stated in her affidavit that she did not know of "any limitation affecting the accuracy or completeness of the assessment made by" Ms. Lewis of Plaintiff's job performance when she made the decision not to promote Plaintiff. (Deveraux Aff. ¶ 9) Plaintiff's allegations concerning the completeness and accuracy of his annual review do not draw into question Ms. Deveraux's affidavit testimony that she relied, honestly and in good faith, on Ms. Lewis's determination that Plaintiff needed improvement in certain areas of his job performance. *See Swackhammer*, 493 F.3d at 1169-70 (evidence that the employer "was mistaken or used poor business judgment" when making a termination decision is "not sufficient to show that the employer's explanation is unworthy of credibility" so as to constitute pretext); *See Juarez-Galvan*, 572 F. App'x at 622 (noting that an employer "need not show its stated reasons were wise, fair, or correct" and that the "test is whether the employer had a good faith belief in its stated nondiscriminatory reason").

Likewise, the Court is not persuaded by Plaintiff's contention that it is implausible that Ms. Deveraux made the promotion decision based on his annual performance review because she actually made promotion decisions six to ten months ahead of the evaluation time period. (Pl.'s Resp. at 16) Plaintiff indicated in his deposition that he reached this conclusion because he saw that the individuals Ms. Deveraux selected and trained for special project work were the employees later selected for promotions. (Pl.'s Dep. at 85:1-12; 87:15-17) However, Plaintiff failed to name specific employees and did not indicate that this practice applied to the employees he claims were promoted—Ms. Madrid, Mr. Garcia, and Mr. Rangel. Instead, he generally stated that "[w]hen promotion time came around, it was clear who had excelled in the past six months, 10 months, because these are the people [assigned special projects] – we all kind of knew who

was going to be promoted ahead of time." (Pl.'s Dep. 85:9-12) He also indicated "that the persons that were friends with [Ms. Deveraux] would be promoted." (Pl.'s Dep. 87:15-19) Again, however, he failed to connect Ms. Deveraux's alleged practice of promoting friends to any of the individuals he claims were promoted in 2010. The Court thus finds Plaintiff's generalized statements in his deposition, without other supporting evidence, to be nothing more than conclusory and self-serving statements that are not sufficient for Plaintiff to carry his burden of showing pretextual discrimination.

- *Defendant's Promotion Practices in Kansas office*

Plaintiff next contends that Defendant's practice of not promoting "foreign individuals" in its Kansas office location is evidence of pretext. Plaintiff relies upon deposition testimony from Ali Lotia, an employee in Defendant's Kansas branch office, who stated that eleven individuals were promoted in that office while he was employed there but that none of these promoted employees was of a different national origin, race or color. (Ali Lotia Dep. 10:24-25, 11:1-3, Feb. 25, 2014 (ECF No. 48-6)) While evidence of an employer's treatment of similarly situated employees can be used to demonstrate pretext,[15] the Tenth Circuit has instructed that "[i]ndividuals are considered 'similarly-situated' when they deal with the same supervisor [and] are subjected to the same standards governing performance evaluation and discipline." *EEOC v. PVNF, LLC*, 487 F.3d 790, 801 (10th Cir. 2007). Here, Plaintiff fails to establish that the Kansas employees were similarly situated to the employees in the Albuquerque office. Plaintiff relies on Mr. Lotia's testimony that Ms. Deveraux was responsible for promoting individuals in the Kansas office and that she was the liaison between the Albuquerque and Kansas offices. (Pl.'s

---

[15] "Pretext may also be shown by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated." *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012).

Resp. at 16) However, Mr. Lotia's testimony was inconsistent and contradictory regarding Ms. Deveraux's role in the Kansas office:

> A: Well, like I said, we did not directly work with [Ms. Deveraux], but our managers did report to her, you know. Everything came down from her. …
> Q: You believe that [Ms. Deveraux] was responsible for the lack of promotions among foreigners?
> A: Yes, I do.
> Q: And what do you base that belief on?
> A: Because the promotions in Lenexa had to go through [Ms. Deveraux] . . .
> Q: And do you know of – I mean, were there people that were promoted that she promoted while you were at Clifton Gunderson?
> A: Well, the thing is, in our Lenexa office, you know, she was in the Albuquerque office, so everything that went through kind of went through her. But she directly did not promote the people in our office.

(Lotia Dep. 10:19 – 11:22) Because there is a lack of record evidence establishing that Ms. Deveraux promoted individuals in the Kansas office, Plaintiff is unable to rely on Defendant's alleged promotion practices in that office in an effort to demonstrate pretext.

In sum, the Court determines that Plaintiff has not demonstrated issues of material fact regarding pretext sufficient to survive summary judgment. Construing the evidence in the light most favorable to Plaintiff, a jury could not reasonably conclude that Defendant's legitimate, non-discriminatory reason for not promoting Plaintiff was a pretext for discrimination based on Plaintiff's Romanian national origin. The Court therefore grants summary judgment in favor of Defendant on Plaintiff's failure-to-promote claim. This claim is dismissed with prejudice.

**2.  Hostile Work Environment Claim under Title VII and the NMHRA**

As indicated earlier, Plaintiff asserts in his complaint that Defendant discriminated against him by "subjecting him to a hostile work environment and forcing him to resign." (Compl. ¶ 21) Title VII and the NMHRA both prohibit an employer from subjecting an employee to a hostile work environment based on race or national origin discrimination. *See*

*Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012); *see also Ocana*, 2004-NMSC-018, ¶ 23.

To survive summary judgment on a hostile work environment claim, Plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment," and that Plaintiff "was targeted for harassment because of [his] race or national origin." *Hernandez*, 684 F.3d at 957 (internal citation omitted). "[There] is not, and by its nature cannot be, a mathematically precise test" for a hostile work environment claim. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Courts determine whether an actionable hostile work environment claim exists by looking at a totality of the circumstances, considering such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. In addition, the Court's analysis of a hostile work environment claim has both objective and subjective components—that is, a plaintiff is required to "show that the environment was both objectively and subjectively hostile or abusive." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

Here, Defendant argues that it is entitled to summary judgment on Plaintiff's hostile work environment for two reasons: (1) it is entitled to an affirmative defense established by the United States Supreme Court in *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); and (2) a reasonable jury could not find that the alleged discriminatory conduct Plaintiff faced was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. (Mot. Summ.

J. at 10-14) The Court will not address the applicability of the *Ellerth/Faragher* defense because Defendant's second argument on the merits of the hostile work environment claim is dispositive.

Plaintiff initially contends that Ms. Deveraux's hostile behavior and conduct towards Plaintiff and other "foreign nationals" gave rise to a hostile work environment. (Pl.'s Resp. at 17-18) Citing to his own deposition testimony and that of his coworkers, Plaintiff alleges that Ms. Deveraux ignored foreign nationals, that she rarely approached them or had any conversations with them, and that she maintained close professional relationships only with people born in the United States. (Pl.'s Dep. 162:1-6; Feng Dep. 35:24-25, 36:1-11; Fialkovsky Dep. 44:14-25) Although Plaintiff and his coworkers perceived Ms. Deveraux to be unfriendly and hostile to them, the Court finds that their deposition testimony consists solely of generalized assertions regarding the workplace environment. Looking at the totality of the circumstances, Plaintiff and his coworkers did not allege that Ms. Deveraux's general behavior was physically threatening or humiliating, or that it unreasonably interfered with their work performance. Moreover, it is well established that Title VII "does not set forth a general civility code" for the workplace, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), and federal law "does not guarantee a utopian workplace, or even a pleasant one." *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998). While Ms. Deveraux may have been unpleasant, rude, or unfair to Plaintiff, the Court determines that a rational jury could not conclude that, viewed objectively, Ms. Deveraux's general workplace conduct constituted actionable harassment under Title VII or the NMHRA. *See Robinson v. Cavalry Portfolio Svcs., LLC*, 365 F. App'x 104, 120 (2010) (stating that "[w]ithout discriminatory overtones, discourteous treatment is simply not sufficient to impose liability under Title VII" and that a district court's "obligation is not to mandate that certain individuals work on their interpersonal

skills and cease engaging in inter-departmental personality conflicts.") (unpublished); *Cf. Musungayi v. Whirlpool Corp.*, 401 F. App'x 346, 349-50 (10th Cir. 2010) (determining that plaintiff's assertions—that his coworker walked around his workspace in a disruptive manner, spread rumors about him, told others that he did not trust the plaintiff, and tried to avoid working with him—did not amount to actionable harassment under Title VII) (unpublished).

Plaintiff next argues that offensive remarks by Ms. Deveraux and two other employees, Virgil Jackson and Mark Caffrey, were severe and pervasive enough to establish a hostile and abusive working environment. (Pl.'s Resp. at 18) Plaintiff cites an email exchange between him and Ms. Lewis, dated April 1, 2011, in which Ms. Lewis stated that she heard Ms. Deveraux use "racial slurs" on multiple occasions. (ECF No. 48-2) Even if the Court were to set aside Defendant's valid concerns regarding the admissibility of this email, the Court observes that the email contains only vague assertions regarding Ms. Deveraux's alleged use of racial slurs without providing any "content, context, or date of such slurs." *Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000). This is not sufficient to create a genuine issue of fact. *See id.* (holding that the plaintiff's claim "regarding the use of racial slurs [was] vague and conclusory, without reference to specific dates or circumstances" and that such "[v]ague, conclusory statements do not suffice to create a genuine issue of material fact."). Furthermore, there is no evidence in the record that Ms. Deveraux used racial slurs or made derogatory remarks about anyone's race or national origin in Plaintiff's presence.

Plaintiff also recalls that Mark Caffrey approached him at work in 2007 and told him "We don't like foreign people." (Pl. Dep. 47:23-25) He further states that after he complained of discrimination internally to human resources in 2011, Virgil Jackson told him "Why are you complaining? . . . [Y]ou should take it, just because [Ms. Deveraux] doesn't like you." (Pl.'s

Dep. 161:14-19) The Court observes that both of these comments were isolated in nature and occurred years apart. As the Tenth Circuit has stated, "[i]t is not the function of Title VII to make a case out of every insulting or unpleasant remark, even those related to protected status. Mere utterance of an epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment to implicate Title VII. Rather, a hostile work environment . . . generally entails a steady barrage of opprobrious comments." *Nettle v. Cent. Okla. Amer. Indian Health Council, Inc.*, 334 F. App'x 914, 922 (10th Cir. 2009) (alterations, internal citations and quotation marks omitted) (unpublished). It is undisputed that Plaintiff was not subjected to a "steady barrage of opprobrious comments." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). The isolated remarks from Mr. Jackson and Mr. Caffrey were not sufficiently severe or pervasive, when considered objectively, that a reasonable jury would regard them as having altered the conditions of Plaintiff's employment.

Lastly, Plaintiff alleges that discriminatory comments directed at employees of different national origins who worked in Defendant's Kansas office serve as evidence of a hostile work environment. (Pl.'s Resp. at 19) "[E]vidence of a general work atmosphere, including evidence of harassment of other racial minorities may be considered in evaluating a [hostile work environment] claim, as long as [the plaintiff] presents evidence that [he] knew about the offending behavior." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1146 (10th Cir. 2008) (brackets and internal quotation marks omitted). Here, Plaintiff relies specifically on Mr. Lotia's deposition testimony regarding comments made by managers in the Kansas office to Mr. Lotia and Mr. Malahifiji.[16] (Pl.'s Resp. at 19) However, there is no evidence establishing Plaintiff's

---

[16] Mr. Lotia testified that Jon Deboer, his manager, once handed him his tuition checks and told him "here are your deportation papers." (Lotia Dep. 37:12-17) On another occasion, Mr. Deboer handed Mr. Malahifiji some paper and told him to keep his "terrorist activities" out of it. (Lotia Dep. 38:15-23)

knowledge of these remarks. Mr. Lotia testimony is undisputed that the offensive remarks were all made before Plaintiff began travelling to the Kansas office for work projects in 2009. (Lotia Dep. 45:10-14) Thus, Plaintiff could not have actually heard these comments. Moreover, Plaintiff does not assert in his response that he became aware of these comments at any point during his employment.[17] *See Hirase-Doi v. U.S. West Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995) (stating that the claimant "may only rely on evidence relating to harassment of which []he was aware during the time that []he was allegedly subject to a hostile work environment") (overruled on other grounds). Due to the lack of evidence establishing Plaintiff's knowledge, the Court is unable to consider the remarks directed at the Kansas employees as evidence of a hostile work environment.

Based on the foregoing, the Court finds that Plaintiff has failed to show genuinely disputed issues of fact on his hostile work environment claim. Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a rational jury could not find that Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter his conditions of employment and create a hostile work environment. The Court therefore grants summary judgment in favor of Defendant on Plaintiff's hostile work environment claim.

### 3.   Constructive Discharge Claim

Plaintiff claims that he was constructively discharged as a result of the hostile work environment he faced. (Pl.'s Resp. at 16, 19-20) "[A] hostile-environment constructive discharge claim entails something more than conduct that amounts to actionable harassment]: A plaintiff

---

[17] Although Plaintiff asserted elsewhere in his briefing that he was once told by a manager in the Kansas office that there were "things" happening in that office to foreign nationals that were "not right" (Pl.'s Resp. at 10; Pl. Dep. 141:2-7), Plaintiff does not identify what these "things" were nor does he allege that the manager told him specifically about the comments directed to Mr. Lotia and Mr. Malahifiji.

who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Hernandez*, 684 F.3d at 961 (citation omitted).

In this case, the Court has already determined that Plaintiff has failed to produce sufficient evidence to support a hostile work environment claim. Accordingly, Plaintiff cannot meet the more onerous burden of showing a constructive discharge claim on the basis of the same facts that were asserted in the context of his hostile work environment claim. *See Robinson*, 365 F. App'x at 121 (holding that the district court was correct in not allowing the employee's constructive discharge claim to go the jury where the employee had failed to establish a hostile work environment); *See Bolden*, 43 F.3d at 552 (holding that the district court properly granted summary judgment on the plaintiff's constructive discharge claim where the plaintiff had "failed to show how his resignation was the result of illegal discriminatory conduct."); *See Sanchez v. Denver Public Schools,* 164 F.3d 527, 534 (10th Cir. 1998) (affirming dismissal of plaintiff's constructive discharge claims where conditions of employment did not amount to a hostile work environment); *Cf. Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1217 n. 6 (10th Cir. 2010) ("Because Ms. Johnson's facts fail to meet the threshold required for a retaliation claim[. . .], it follows that those same facts cannot satisfy the higher threshold required for a constructive discharge claim."). Accordingly, Defendant is entitled to summary judgment on Plaintiff's constructive discharge claim.

## 4.  Retaliation Claim under Title VII and the NMHRA

Plaintiff alleges in his complaint that he suffered damages "as a result of Defendant's retaliatory practices." (Compl. ¶ 23) "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that '(1) []he engaged in protected opposition to discrimination; (2)

[]he suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between [his] opposition and the employer's adverse action.'" *Johnson*, 594 F.3d at 1215 (internal citation omitted).

As the Court noted earlier, Defendant did not indicate in its motion that it was seeking summary judgment on Plaintiff's retaliation claim. (Mot. Summ. J. at 1) However, the Court finds that both parties have extensively set forth material facts relevant to the retaliation claim in their briefing on Defendant's motion for summary judgment. Specifically, the Court identifies these material facts that appear to be genuinely undisputed: (1) Plaintiff engaged in protected activities by reporting his claim of national origin discrimination both internally to Ms. Zorgdrager and to the EEOC in April 2011 (ECF No. 43-4; ECF No. 43-6; ECF No. 43-3 at 5); and, (2) alleged adverse actions taken by Defendant after Plaintiff reported his claim of discrimination, such as Ms. Deveraux walking behind him and brushing up against his chair. (Pl.'s Dep. 161:25 – 162:1-11)

Fed. R. Civ. P. 56(f) gives the Court authority to grant summary judgment, if appropriate, independently of Defendant's motion after giving notice of its intention to do so, and a reasonable time to respond. Specifically, the rule provides that "[a]fter giving notice and a reasonable opportunity to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." *Id.* Because it appears to the Court that the parties have already set forth facts that are material to Plaintiff's retaliation claim, the Court will exercise its authority under Rule 56(f) to consider summary judgment on this claim. The Court therefore orders the parties to respond no later than July 13, 2015, with briefing on Plaintiff's retaliation claim. Specifically, each party is instructed

to set forth any ground, factual or legal, in support or in opposition to the entry of summary judgment on Plaintiff's retaliation claim. In addition, in order to avoid duplicative exhibits, re-submission of exhibits already in the record will be disallowed. No extensions of time for the written submissions from the parties will be given absent extraordinary circumstances.

## D.  CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (ECF No. 43) is granted. Accordingly, Plaintiff's failure-to-promote, constructive discharge and hostile work environment claims are dismissed with prejudice.

**IT IS FURTHER ORDERED** that the parties are to respond no later than July 13, 2015, with briefing for the Court to consider in ruling on summary judgment on Plaintiff's retaliation claim.

**IT IS SO ORDERED.**


_____
SENIOR UNITED STATES DISTRICT JUDGE